ATTORNEY GENERAL *vs.* FREDERICK W. HERRICK.

Essex.    January 3, 1906. — February 26, 1906.

Present: KNOWLTON, C. J., MORTON, HAMMOND, LATHROP, & SHELDON, JJ.

*Great Pond.    Island.    Commonwealth.*

By the Colony ordinance of 1641 or 1647 the General Court took away from towns to which no grants had been made all power to act further in reference to great ponds not appropriated to individuals, and appropriated the ponds to the use of the public.

An island in a great pond, insignificant in size, rocky and sterile, worthless for agriculture or grazing, which never has been appropriated to any other than a public use, belongs to the Commonwealth.

Whether there might be in a great pond an island of such size, shape and character that after the passage of the Colony ordinance of 1641 or 1647 the town in which it lay could appropriate it to the use of a private person, *quære.*

INFORMATION by the Attorney General, filed January 14, 1903, under R. L. c. 188, to recover Loon Island in Chebacco Pond in the town of Hamilton, alleged to have been unlawfully entered upon and held by the defendant.

In the Superior Court the case was referred to Alden P. White, Esquire, as auditor.   Later the case came on for trial before *Lawton,* J.   No evidence except the auditor's report was introduced.   The judge found, that, if under the order of reference any finding of facts by him was necessary, the facts were as stated in the auditor's report, and ruled *pro forma* that on these facts judgment should be entered for the defendant.   At the request of the parties he reported the case for determination by this court.   If his ruling was right, judgment was to be entered for the defendant; if not, judgment was to be entered for the plaintiff or such entry was to be made as the law might require.

Upon the whole case the auditor found for the defendant, finding that the Commonwealth does not own Loon Island.   His finding in regard to the size and character of the island is quoted in the opinion, where other material facts found by the auditor also are stated.   It was found by him as an admitted fact that on or about February 20, 1901, the defendant entered upon Loon Island " for the purpose of acquiring title thereto by adverse possession," that he erected a camp house thereon, and that he

ever since has been in possession of the island under a claim of right, assuming to own and control it.

R. G. Dodge, Assistant Attorney General, for the plaintiff.

U. G. Haskell, for the defendant.

N. Matthews & J. M. Hallowell, for the city of Medford, filed a brief by leave of court.

KNOWLTON, C. J.    This is an information brought by the Attorney General under the R. L. c. 188, to recover an island in Chebacco Pond, in the town of Hamilton, recently entered upon and held by the defendant.    The question is whether, as against an intruder, the Commonwealth has a title to this island in a great pond, no part of which has ever been granted or conveyed by the town in which it is situated, or by the Colony, the Province or the Commonwealth, unless it be held that recognition of the town by the Colony, before the adoption of the Body of Liberties of 1641–47, was a grant which finally transferred the legal title.    In this colonial ordinance is this language : "Provided, that no town shall appropriate to any particular person or persons, any great pond, containing more than ten acres of land," etc.    Also the following : "And for great ponds lying in common, though within the bounds of some town, it shall be free for any man to fish and fowl there, and may pass and repass on foot through any man's propriety for that end, so they trespass not upon any man's corn or meadow."    Anc. Chart. 148, 149.    All such property then unappropriated was thereby reserved for a public use.

The report of the auditor shows that Chebacco Pond has never been appropriated to any person or persons, but has been held in accordance with this ordinance.    It also appears from the report that no grant was ever made by the Colony to any persons as proprietors, nor to the town, although there was a recognition of the town, with such rights as were ordinarily exercised by towns which had no formal incorporation nor any formal grant of land.    There were numerous such towns in existence at the time of the adoption of this colonial ordinance, and there were many great ponds in them.    While, so far as we know, there is no express decision in Massachusetts upon an issue arising between a town and the State, as to whether the legal title to great ponds is in the towns or in the State, there

are many cases in which it has been said that the title is in the Commonwealth. Here are quotations from some of them : " The law of Massachusetts . . . has treated great ponds as of a character nearly resembling tide waters . . . the title in which and the lands under them was not the subject of private property, unless by special grant from the Legislature." *Paine* v. *Woods,* 108 Mass. 160, 169. " Great ponds are public property, the use of which for taking water or ice, as well as for fishing, fowling, bathing, boating, or skating, may be regulated or granted by the Legislature at its discretion. . . . The pond and the water therein belonged not to the petitioners, but to the public." *Fay* v. *Salem & Danvers Aqueduct,* 111 Mass. 27, 28. " By the law of Massachusetts, great ponds, not appropriated before the Colony Ordinance of 1647. to private persons, are public property, the right of reasonably using and enjoying which . . . is common to all." *Hittinger* v. *Eames,* 121 Mass. 539, 546. " No question is made that, under the laws of this Commonwealth, Spy Pond is a great pond. It is therefore public property," etc. *Gage* v. *Steinkrauss,* 131 Mass. 222. " The great ponds of the Commonwealth belong to the public, and, like the tide waters and navigable streams, are under the control and care of the Commonwealth." *Attorney General* v. *Jamaica Pond Aqueduct,* 133 Mass. 361, 364. " Under the ordinance, the State owns the great ponds as public property, held in trust for public uses." *Watuppa Reservoir Co.* v. *Fall River,* 147 Mass. 548, 557. " They [the colonists] reserved to the Colony the property in the ponds themselves, the better to regulate these and other kindred public rights for the common good." " The ordinance secures to the Commonwealth, in great ponds, the same kind of ownership in the water that an individual purchaser of the entire area of a small pond would get by a perfect deed, or by an original grant from the government without restrictions." Minority opinion in the last case, pages 564, 566. " The Commonwealth was the owner of the great pond before the taking." *Proprietors of Mills* v. *Commonwealth,* 164 Mass. 227, 229. In *Potter* v. *Howe,* 141 Mass. 357, 360, a great pond had been artificially lowered, so as to leave a strip of land uncovered between the original water line and the lower water line. The court said : " By the withdrawal of the water by the defendants, a strip of land, the title

to which is in the State and the use in the public, is interposed between his land and the water of the pond." In *Auburn* v. *Union Water Power Co.* 90 Maine, 576, 584, the court said, " It is a settled rule of law in this State and Massachusetts that all great ponds, — that is, ponds containing more than ten acres, — are owned by the State. This is a rule of law peculiar to this State and Massachusetts. It is said to have been derived from the Colonial Ordinance of 1641-7." These quotations show the construction put upon the ordinance, in its application to existing conditions, where great ponds had not been previously appropriated to individuals. The statements in the opinions are general, applying to ponds in towns which were settled and recognized before the adoption of the ordinance, as well as to those settled later. In several of the cases it distinctly appears that the pond is in a town which was a part of a town existing prior to 1641. So far as we are aware, there is no case in which it has been decided that the title to a great pond is held by a city or town, and the only cases in which that is treated as possible or probable are those in which a prior grant from the Legislature was proved or assumed. *West Roxbury* v. *Stoddard*, 7 Allen, 158. *Attorney General* v. *Revere Copper Co.* 152 Mass. 444, 448. In the former case there was a colonial act which was relied on as a grant, and in the latter a grant was distinctly shown. In the latter case is this language : " It is held that the title to great ponds which had not previously been granted is in the Commonwealth for the benefit of the public, and, if a pond had previously been granted to a town, and had not passed to a private person, the legal title remains in the town, but the beneficial right is in the public." This is a distinct recognition of the difference between cases in which there had been an express grant to a town and those in which there had been no grant.

It may be well to consider what were the relations of towns to the local land when no grant was made, in the early years of the colony. They were undoubtedly authorized, expressly or by implication, to represent all public interests, to a large degree, in local matters, subject to the direction and control of the Colony. They were in possession of the land within their recognized boundaries, with authority to appropriate it to individual

settlers, and to manage for the general good that which was left in common. But, until it was appropriated, they had no title which they could set up against the general rights of the Colony. In their distribution of land and in the management of that which remained public, they exercised authority which originally belonged to the Colony alone, and in the absence of a grant, they acted as representatives of the central power and ownership. In *Commonwealth* v. *Roxbury*, 9 Gray, 451, 500, Chief Justice Shaw said, " Even an act of incorporation, without an express grant of the lands within it, would not, in our judgment, effect a transfer of the public lands. Such an act, with limited bounds, would pass municipal jurisdiction, but not soil." So on page 501, "All the early acts fixing boundaries between towns . . . have no tendency to prove or disprove title; they affect the question of jurisdiction only, and for the purpose of the present inquiry may be laid out of the case." See *Litchfield* v. *Scituate*, 136 Mass. 39, 44. In *Porter* v. *Sullivan*, 7 Gray, 441, 443, 444, Chief Justice Shaw says, " All private property or ownership in land, within the limits of the Colony of Massachusetts, must be derived from a grant of the colonial government. . . . Of course, all the early records of the Colony are filled with acts prescribing the bounds of each township; but such acts, intended solely to fix the limits of jurisdiction, are never used as instruments for granting land." In *West Roxbury* v. *Stoddard*, 7 Allen, 158, 169, Mr. Justice Hoar said of a town holding lands, where the grant was not to individuals and where the evidence tended to show a grant to the town : " Its functions were then of a two-fold nature : to distribute the lands among the freemen for the purposes of settlement, reserving such parts as might be deemed requisite for various public uses; and to do its part as a constituent member of the new state, bearing its proportion of the public burdens; clothed with limited powers of self-government in local matters; but amenable to the Commonwealth, and subject to its control and direction. There can be no doubt that from the earliest period the legislature of the Colony exercised the unquestioned authority of deciding what public duties should be discharged by the towns, including not only appropriations of money, but of lands. . . . The right to change the boundaries of towns, and to create new ones from the territory of towns

already existing, was never questioned." In *Boston* v. *Richardson*, 13 Allen, 146, 150, Mr. Justice Gray uses this language : " On the 3d of March 1635-6 the general court enacted that the freemen of every town should ' have power to dispose of their own lands and woods, with all the privileges and appurtenances of the said towns, to grant lots, and make such orders as may concern the well ordering of their own towns, not repugnant to the laws and orders here established by the general court.' 1 Mass. Col. Rec. 172. It appears however by the records of the colony that the rights and powers of the towns in lands within their limits were considered as subordinate to the paramount power of the general court at its discretion to grant lands in any town, not already granted to individuals. 1 Mass. Col. Rec. 101, 102, 103, 111, 129, 130, 240." So in *Lynn* v. *Nahant*, 113 Mass. 433, 448, we find these words : " The lands within the limits of a town, which had not been granted by the government of the Colony either to the town or to individuals, were not held by the town as its absolute property, as a private person might hold them, but, by virtue of its establishment and existence as a municipal corporation, for public uses, with power by vote of the freemen of the town to divide them among its inhabitants, yet subject to the paramount authority of the General Court, which reserved and habitually exercised the power to grant at its discretion lands so held by the town."

When the colonial ordinance of 1641-47 was adopted, the General Court took away from the towns to which no grants had been made all power to act further in reference to great ponds not appropriated to individuals, and appropriated the ponds to the use of the general public. Under the enactment of the General Court quoted above from *Boston* v. *Richardson*, towns, in the absence of a grant, had nothing but a delegated authority which the General Court might at any time terminate. The general government was the natural owner and controller of property held for the public, and as the towns had no absolute title, on the adoption of the ordinance the original title of the Colony remained perfect, with no right in the towns any longer to interfere with it. This we conceive to be the ground on which the court has proceeded in reaching the conclusions quoted above.

Our Legislature, in recent statutes, has recognized the rights of the Commonwealth in great ponds, not only as to the public use of them, but also as to the title. St. 1869, c. 384, § 9. Pub. Sts. c. 91, § 12. Pub. Sts. c. 196, § 11. R. L. c. 202, § 30. R. L. c. 96, §§ 15, 16, 18, 27. We are of opinion that the title to Chebacco Pond is in the Commonwealth.

The defendant contends that, even if the pond is owned by the State, Loon Island is not included in it. The auditor found "that Loon Island is insignificant in size, rocky and sterile; that previous to the defendant's occupation it has never been continuously used or occupied by anybody, and that it is worthless for agriculture or grazing. Fishermen and boating parties from picnic grounds on the shore and elsewhere have landed on the island when and as they pleased, without prohibition from any source, and doubtless gunners have built blinds thereon, behind which they have held tenure according to the patience of their kind." Whether all islands in great ponds are to be treated as parts of the ponds, under this ordinance, may be a question not free from doubt. Ordinarily a grant of a pond as a piece of real estate would include the entire area within its borders. Islands in rivers, within the boundaries where the line extends to the thread of the stream, are included within grants. *Lunt* v. *Holland,* 14 Mass. 149. *Ingraham* v. *Wilkinson,* 4 Pick. 268. *Deerfield* v. *Arms,* 17 Pick. 41. *Hopkins Academy* v. *Dickinson,* 9 Cush. 544. *Nichols* v. *Suncook Manuf. Co.* 34 N. H. 345. *Kimball* v. *Schoff,* 40 N. H. 190. See *People* v. *Warner,* 116 Mich. 228, and *Canal Commissioners* v. *People,* 5 Wend. 423, in which latter case Chancellor Walworth says that "Our local law appears to have assigned . . . the beds of the lakes with the islands therein to the public." In an official answer to an inquiry by the board of harbor and land commissioners, Attorney General Knowlton gave an opinion that the islands in great ponds are the property of the Commonwealth. Attorney General's Report for 1901, pages 55, 56.

While there are grounds for an argument that the ordinance of 1641–47 had reference only to the waters of the great ponds and the land under them, there is much force in the suggestion that the expressions "great pond, containing more than ten acres of land," and "great ponds lying in common, though within the

bounds of some town," refer to great ponds as physical features of the country, including any islands within them.

But in the present case we need not decide this question, for it is plain that this island is not one that would naturally be separated in ownership from the land under the water and from the water itself. There is nothing in it which ever would have called for an appropriation of it to any other than a public use, and it never has been so appropriated. The title to it has been treated by the town and by everybody as going with the title to the rest of the pond. Without finding it necessary to determine whether there might be an island of such size and shape and character that the town might lawfully appropriate it to a private person after the passage of the ordinance of 1641–47, we are of opinion that the title to this island has never been separated from the title to the pond, and that it belongs to the Commonwealth.

*Judgment for the plaintiff.*