### Carter E. Lace, et al. v. University of Vermont and State Agricultural College

[303 A.2d 475]

No. 163-71

Present: Shangraw, C.J., Barney, Smith, Keyser and Daley, JJ.

Opinion Filed April 3, 1973

*Frederick J. Fayette, Esq.,* Burlington, for Plaintiffs.

*Latham, Eastman & Tetzlaff,* Burlington, for Defendant.

**Smith, J.** This is an appeal by the defendant, University of Vermont and State Agricultural College, from a judgment of the Franklin County Court in Chancery declaring the mandatory assessment of the student activities fee (also known as the student association fee) by the defendant university against the plaintiffs to be unconstitutional.

The plaintiffs, at the time this action was commenced, were students at the defendant university. As a requirement of enrollment, the plaintiffs were obliged to pay a student activities fee in the amount of $21.50 per student. This fee was collected by the defendant university along with the tuition fee and all other enrollment fees and deposited into and with its other accounts. The defendant university then transferred from its deposits to accounts designated for student association use amounts equal to the sums collected by it as student activities fees. In the academic year preceding this action, the total amount collected as student activities fees amounted to $112,000.00. The student activities fee was found by the county court to be "assessed and allocated by the student association toward the support of student organizations and student activities."

There were at the time this action was commenced approximately one hundred and five student organizations on the cam-

pus of the defendant university. The only organizations which received financial aid from the student association were those which submitted requests and obtained approval from both the student senate and the budget or finance committee of the student association. However, before any funds could be expended by a student organization, such expenditure required the signature of the faculty, administrative or student advisor of that organization. The board of trustees of the defendant university also maintained a continuing student activities committee, whose members were all trustees of the defendant university.

The mandatory student activities fee was voted on by the student senate, which is the legislative body of the student association. When this action was commenced, the student senators were elected by the students of the defendant university in proportion to the occupancy of dormitories and housing units, both on and off campus. In order to speak before the student senate, one had to be a student senator, an advisor, an officer, or one petitioning the student senate. All others wishing to speak before the student senate were required to request and receive a two-thirds majority approval from the senate itself.

Disbursement of the student association funds, after having been segregated and designated as such, was the responsibility of the bursar's office of the defendant university at the commencement of this action. Its interest in such disbursement was confined to bookkeeping procedures: examining vouchers and requests for funds, and issuing checks for the disbursement of these funds. It did not inquire into the purpose and nature of the expenditures.

On February 26, 1971, the plaintiffs instituted this action by bringing a petition for declaratory judgment praying that the Chancellor of the Franklin County Court in Chancery declare the student activities fee was not a lawful mandatory fee, or in the alternative that the trustees of the defendant university

> ". . . be charged with the responsibility of supervising the expenditure of said fees and that the said funds not be disbursed without the Trustees first making a determination that the purpose for which the funds are to

be expended are educational, cultural, recreational or social in nature."

The heart of the plaintiffs' objection to the assessment of the mandatory student activities fee was found in paragraph eight of their petition:

"These named Plaintiffs and all other students similarly situated have been forced to finance, through the assessment of the mandatory activities fee, actions and activities which they wholly and totally disapprove; have been compelled to give financial support to persons advocating positions and views with which they wholly disagree; and have, by reason of said unauthorized and improper expenditure of funds, been cast in a public image of non-patriotism, lack of respect for duly constituted authority, and utter disregard for the rights and responsibilities of others,—an image which these Plaintiffs abhor and reject."

The principal objections of the plaintiffs were to the expenditure of funds by the student association through the speakers bureau, for the campus newspaper entitled the *Cynic*, for defraying the expenses of the president of the student association for attending a national student conference at the University of Michigan, and the purchase of certain films.

The speakers bureau was established for the purpose of coordinating requests for speakers by the various organizations on campus. The trustees of the defendant university promulgated a speaker's policy in 1965. It provided, among other things that: (1) the opportunity be offered to balance a speaker with one of differing opinions; (2) the meeting be chaired by a tenured faculty member; and (3) the speaker be subject to interrogation by the audience. During the time preceding the institution of this action, the county court found that speakers were presented on the defendant university's campus and reimbursed out of student association funds "who by their conduct, views and political philosophy have become and are highly controversial individuals."

The *Cynic*, the campus newspaper, to which $21,000.00 of the student association funds were appropriated during the

academic year immediately preceding this action, was found by the county court to have

"... consistently published editorials of a radical persuasion; espoused the causes of radical student unions; used its editorial pages to advocate political activism; published articles that have resulted in embarrassment to the plaintiffs; accepted advertisements for contraceptives; ridiculed and accused the President of the country of political guttersnipery and attacked him for 'politicking'...."

The court went on to find that the *Cynic*

"... has pursued a course of blatant abuse of its rights as a free press and has evidenced a narrow-minded, dogmatic disgust with anything and anyone disagreeing with its policy, its beliefs and opinions, all contra to the pronounced policy of a free and independent campus publication."

The national student conference, attended by the president of the student association, was found by the county court to be where demonstrations were planned to be held in Washington, D.C. The county court also found that the expenditure of student association funds for the purpose of defraying the expenses of the attendance of the president of the student association to attend this conference was approved by an individual who held both the posts of student advisor and director of student activities.

The films to which the plaintiffs objected to the purchase of with student association funds were found by the county court to be "revolutionary".

The county court found that not only were such functionalisms and behaviors repugnant to the plaintiffs "as loyal and patriotic citizens", but also because they were compelled to contribute their money to the defendant university in support of them by payment of the student activities fee required by the defendant university.

The county court, in its judgment order, found that the mandatory assessment of the student activities fee by the defendant university "to be in violation of the due process clause

of the Constitution of Vermont and the Constitution of the United States" as long as the present method of supervision, control and responsibility for the expenditure and disbursement of the funds derived from the student activities fee should continue. The court also ordered the trustees of the defendant university to assume the responsibility, control and supervision of the expenditure and disbursement of the funds for uses and purposes "as in their sound practical judgment will contribute in the greatest degree to the educational, cultural, social, and recreational activities and functions of the Defendant University campus community."

■ The function of a declaratory judgment is to provide a declaration of rights, status and other legal relations of parties to a justiciable controversy. 12 V.S.A. § 4711; *Beecham* v. *Leahy,* 130 Vt. 164, 167, 287 A.2d 836 (1972). Without such justiciable controversy being present, the declaratory judgment can provide no more than an advisory opinion, which our State judiciary does not have the constitutional power to render. *In re House Bill 88,* 115 Vt. 524, 529, 64 A.2d 169 (1949).

In examining the nature of a justiciable controversy, Mr. Justice Frankfurter observed in his concurring opinion in *Joint Anti-Facist Committee* v. *McGrath,* 341 U.S. 123, 150 (1951):

> "But in a case raising delicate constitutional questions it is particularly incumbent first to satisfy the threshold inquiry whether we have any business to decide the case at all. Is there, in short, a litigant before us who has a claim presented in a form and under conditions 'appropriate for judicial determination'? *Aetna Life Ins. Co.* v. *Haworth,* 300 U.S. 227, 240."

Mr. Justice Frankfurter continued:

> "To require a court to intervene in the absence of a statute, however, either on constitutional grounds or in the exercise of inherent equitable powers, something more than adverse personal interest is needed. This additional element is usually defined in terms which assume the answer. It is said that the injury must be 'a wrong

which directly results in the violation of a legal right.' *Alabama Power Co.* v. *Ickes,* 302 U.S 464, 479." 341 U.S. at 151–52.

The plaintiffs herein maintain that they were being forced to support financially causes or philosophies with which they disagree as the claim adequate for judicial determination. The legal right claimed violated is freedom of association guaranteed in Article 20 of the Declaration of Rights of the Vermont Constitution and the First Amendment of the United States Constitution. In support of this contention, the plaintiffs cite *International Association of Machinists* v. *Street,* 367 U.S. 740 (1961), wherein it was held that § 2, Eleventh of the Railway Labor Act, requiring each employee of a carrier to pay union dues as a condition of continued employment, denied the union to which the dues were paid the power to use, over an employee's objection, his exacted funds to support political causes which he opposed. The plaintiffs quote from the concurring opinion of Mr. Justice Douglas:

> ". . . If an association is compelled, the individual should not be forced to surrender any matters of conscience, belief or expression. He should be allowed to enter the group with his own flag flying, whether it be religious, political, or philosophical . . . and he should not be required to finance the promotion of causes with which he disagrees." 367 U.S. at 776.

However, we cannot find from the record that the plaintiffs either pled or proved that they were required through the assessment of the mandatory student activities fee to finance the promotion of religious, political, or philosophical causes. The plaintiffs have shown that the funds derived from the mandatory student activities fee were utilized for the introduction of certain positions and views with which they disagreed into the campus community of the defendant university by student organizations through speech, press, films and associating with students of other educational institutions. As the "speakers corner" of Hyde Park in London provides a platform for the espousing of social, religious and political ideas by various and divergent individuals, so the student association funds provide the monetary platform for

various and divergent student organizations to inject a spectrum of ideas into the campus community. In noting this function of the disbursement of the student association funds, the dissenting opinion of Mr. Justice Holmes in *Abrams* v. *United States*, 250 U.S. 616, 630 (1919), comes to mind:

> ". . . But when men have realized that time has upset many fighting faiths, they may come to believe even more than they believe the very foundations of their own conduct that the ultimate good desired is better reached by free trade in ideas—that the best test of truth is the power of the thought to get itself accepted in the competition of the market, and that truth is the only ground upon which their wishes can safely be carried out."

This use of student association funds to which the plaintiffs were required to contribute in this manner is far from the prohibition announced in *International Association of Machinists* v. *Street, supra.* And the plaintiffs do not show that they were denied equal and proportional access to the same student association funds utilized by student organizations to advocate "positions and views with which they wholly disagree" in order to advocate positions and views with which they wholly agree. Nor do they show that the defendant university had taken any action to forbid the making of their views known to others in the campus community through the use of speech, press, films and association. See *Tinker* v. *Des Moines Community School*, 393 U.S. 503, 513–14 (1969). Minus the allegation and proof of these conditions, the plaintiffs did not present the county court with a justiciable controversy and the county court, therefore, did not have the jurisdiction to entertain the plaintiffs' petition for declaratory judgment. *Alabama Federation of Labor* v. *McAdory*, 325 U.S. 450, 461 (1945) ; *Beecham* v. *Leahy, supra,* 130 Vt. at 167.

The plaintiffs also imply that the expenditures of student association funds in the above manners with which they disagree was lacking in educational, cultural and recreational value. The county court, in discussing some of the functions for which these funds were expended, found, "Few would seriously contend that [anything was contributed] to the

University Campus that could be termed 'cultural, educational, or recreational.' " The county court also ordered the trustees of the defendant university to intervene in the expenditures of those funds to determine in their judgment what "will contribute in the greatest degree to the educational, cultural, social, and recreational activities and functions of the Defendant University campus community."

However, the fact that certain ideas are controversial and wholly disagreed with does not automatically make them non-educational. Mr. Justice Brennan, writing for the Court in *Keyishian* v. *Board of Regents of New York*, 385 U.S. 589, 603 (1967), regarded the introduction of controversial ideas into the educational process in this light:

> ". . . The classroom is particularly the 'marketplace of ideas'. The Nation's future depends upon leaders trained through wide exposure to that robust exchange of ideas which discovers truth 'out of a multitude of tongues, (rather) than through any kind of authoritative selection.' *United States* v. *Associated Press*, 52 F.Supp. 362, 372."

See also "Education as Politics," Chapter 18 of John Dewey's *Education Today* 157–63 (J. Ratner ed. 1940).

We here hold that the Franklin County Court was without jurisdiction to entertain this petition for declaratory judgment *sans* a justiciable controversy on the authority of *French* v. *French*, 128 Vt. 138, 139, 259 A.2d 778 (1969), and *In re McMahon Children*, 115 Vt. 415, 417, 63 A.2d 198 (1949). As such, the judgment order of the Franklin County Court is invalid and held for naught. *In re McMahon Children, supra*, 115 Vt. at 421, 63 A.2d 189. Since no purpose would be served for a remand of this cause, we will enter final judgment here. *Eurich* v. *Coffee-Rich, Inc.*, 130 Vt. 537, 298 A.2d 846, 850 (1972).

*Petition for declaratory judgment dismissed, and the judgment rendered reversed and held for naught.*